IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                      Case No. 22–CR–1841 KG

JEFFREY STEVEN CLAY,

    Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Defendant Jeffrey Steven Clay's Motion for New Trial. (Doc. 106). Mr. Clay was convicted by a jury of one count of kidnapping and one count of transportation for illegal sexual activity in violation of 18 U.S.C. § 1201 and 18 U.S.C. § 2421. Jury Verdict (Doc. 104). In his motion for new trial, Mr. Clay challenges the sufficiency of the evidence and asks the Court to reconsider admissibility of certain evidence. Having considered the briefing, trial transcript, and evidence in the record, the Court denies the Motion.

*I.*    *Background*

Parties do not dispute that on or about August 4, and 5, 2021, Mr. Clay and Jane Doe 1 traveled from El Paso, Texas, to Mr. Clay's home in Anthony, New Mexico. During the trial, Jane Doe 1 and Mr. Clay gave differing recounts of the events that took place.

    *A. Jane Doe 1's Testimony*

According to Jane Doe 1, she was standing at a bus stop across from a Church's Chicken on August 4, 2021, when Mr. Clay offered to give her a ride to a friend's house on Octavia Street. May 2, 2023 Tr. (Doc. 136) at 233–34. She accepted the ride and, after getting in the car,

placed ten dollars on the middle console. *Id.* at 235.  While Mr. Clay was driving, the two

introduced themselves and had casual conversations. *Id.* at 235–36.  At some point, Jane Doe 1

realized Mr. Clay was not taking her to Octavia Street, however, she did not confront Mr. Clay at

that time. *Id.* at 236.  Jane Doe 1 testified Mr. Clay never asked her to go anywhere with him nor

did she agree to go anywhere other than Octavia Street. *Id.* at 238.  To appear calm, Jane Doe 1

continued conversations with Mr. Clay while trying to enable location services on her phone. *Id.*

at 236–38.  Sometime after her efforts, the phone fell, and she was unable to retrieve it. *Id.* at

238.

Mr. Clay and Jane Doe 1 later arrived at Mr. Clay's home in Anthony, New Mexico. *Id.*

at 239.  The house is in an isolated, dark area. *Id.* at 240.  According to Jane Doe 1, Mr. Clay

parked the car outside of the home, and the two entered the home through the front door. *Id.*

She met Mr. Clay's dog, Jackson, then the two consumed alcoholic beverages and listened to

country music. *Id.* at 241.

After some time, Mr. Clay and Jane Doe 1 moved towards the pool area. *Id.*  She asked

Mr. Clay if she could retrieve her phone from the vehicle. *Id.* at 242.  Mr. Clay walked out of the

room leaving Jane Doe 1 with the impression that he went to get her phone. *Id.*  While Mr. Clay

was gone, she removed her jeans and shirt and entered the pool. *Id.* at 242–43.  Mr. Clay

returned and joined her in the pool. *Id.* at 243.  Once in the pool, Mr. Clay attempted to kiss her,

but she pushed him away. *Id.*  Then Mr. Clay hit Jane Doe 1 and placed her in handcuffs behind

her back. *Id.* at 244–45.

Jane Doe 1 testified Mr. Clay escorted her to the back bedroom after they exited the pool.

*Id.* at 246.  Once they were in the bedroom, Mr. Clay pushed her on the bed, began kissing her

body, and placed his fingers in her genitals. *Id.* at 247. Despite Jane Doe 1 asking Mr. Clay to stop, he continued until it was not "enjoyable for him." *Id.* at 248.

According to Jane Doe 1's testimony, Mr. Clay stopped momentarily to locate his personal lubricant. *Id.* at 249. After using the lubricant, he began penetrating her with his penis while she begged him to stop. *Id.* at 250. On more than one occasion, Mr. Clay told her that he was doing this because she was a "bad girl" and she needed to be a "good girl." *Id.* at 245, 249. Mr. Clay flipped her on her stomach and began penetrating her anally with his penis. *Id.* Sometime after, Mr. Clay put his penis in Jane Doe 1's mouth and ejaculated. *Id.* at 150.

After Mr. Clay ejaculated, he began to clean himself and allowed Jane Doe 1 to use the restroom. *Id.* at 251. Once she was out of the restroom, Mr. Clay led her towards the dining area and retrieved her clothes. *Id.* at 252. Jane Doe 1 was still handcuffed, so Mr. Clay put her underwear and pants on for her. *Id.* Before taking the handcuffs off, Mr. Clay asked, "if I take off the handcuffs, are you going to be a good girl?" *Id.* at 252–53. She responded affirmatively, and Mr. Clay removed the handcuffs. *Id.* at 253.

Jane Doe 1 testified she told Mr. Clay she needed to leave, and after some exchange, they began to exit the house, this time through the garage. *Id.* She asked him to take her to her mother in law's residence but provided a different address for safety reasons. *Id.* They entered the truck, a different vehicle than what they arrived in, and Mr. Clay began driving. *Id.* at 254–55. Jane Doe 1 testified she was not able to retrieve her cell phone from the previous vehicle. *Id.* at 255.

While Mr. Clay drove Jane Doe 1 back into El Paso, Texas, he told her he was a "cop," and if she reported the attack, he would be able to charge her with assault on an officer. *Id.* at 256. Once the vehicle exited the freeway and stopped at a traffic light, she exited and began

running. *Id.* at 256–57.  Mr. Clay did not follow her.  *Id.* at 258.  She ran to the nearest business, a Circle K, and asked the clerk if she would call 911.  *Id.* at 257–58.  Jane Doe 1 was upset so the clerk assisted the phone call.  *Id.* at 259.  A police officer and ambulance arrived shortly after the call.  *Id.* at 259.  Jane Doe 1 was transported to the University Medical Center El Paso where she was examined and interviewed by police officers.  *Id.*

At the close of her testimony, the prosecution admitted numerous pictures of Jane Doe 1 which were taken the morning of the incident.  *Id.* at 160–62.  These included pictures of her wrists with markings from the handcuffs and injuries to her eye.  *Id.*

      *B.  Mr. Clay's Testimony*

Mr. Clay testified he was on his way to get dinner from Church's Chicken the night of August 4th, when he stopped at a red traffic light.  May 4, 2023 Tr. (Doc. 138) at 15–16.  While at the light, Jane Doe 1 walked in front of his vehicle and smiled.  *Id.* at 16.  Mr. Clay smiled, and both exchanged waving signals.  *Id.*  Jane Doe 1 walked over to Mr. Clay's truck and asked for a ride.  *Id.* at 16.  She told Mr. Clay she was going five minutes down the street.  *Id.* 16–17.  Mr. Clay agreed to give her a ride, and she entered his truck.  *Id.* at 17.

Consistent with Jane Doe 1's testimony, the two carried on conversations during the ride.  *Id.*  Jane Doe 1 told Mr. Clay that she was homeless and did not have any family.  *Id.* at 18.  Mr. Clay testified Jane Doe 1 never gave him an address, she only told him to head down the road.  *Id.*  At one point, he asked her if he should keep going straight, and she said yes.  *Id.*

Once they got closer to his home, Jane Doe 1 asked Mr. Clay where he lived and said it was further away than she thought.  *Id.* at 22.  After they crossed state lines, Jane Doe 1 told Mr. Clay she would have to charge him more.  *Id.* at 22, 25.  Mr. Clay inquired, and she stated she was going to charge him a set amount for sexual services.  *Id.*  Initially, Mr. Clay did not

anticipate this conversation but was not surprised. *Id.* at 22–23. He agreed to her prices because she was very flirty, and he was enjoying it. *Id.* at 23. During his testimony, Mr. Clay explained the prices were "probably" correct based on his past experiences with prostitutes. *Id.* at 24. Mr. Clay testified that for the remainder of the car ride, Jane Doe 1 never objected to going to his house. *Id.* He recalled seeing her with a cell phone but could not tell if she was using it. *Id.* at 25.

Mr. Clay testified they arrived at his home around 9:30 PM. *Id.* at 26. He drove his vehicle into the garage, and the two exited the vehicle. *Id.* at 27. While Jane Doe 1 was exiting, Mr. Clay saw her phone fall off her lap, he retrieved both his phone and hers, and they entered the house. *Id.* Inside the house, Jane Doe 1 met Mr. Clay's dog, Jackson, and the two let him outside. *Id.* at 29. When they were outside, Jane Doe 1 noticed the pool and informed Mr. Clay she would have to charge him more money for her services. *Id.* Mr. Clay responded they had already agreed on a price. *Id.*

Jane Doe 1 then asked if she could swim so Mr. Clay retrieved the key from inside, opened the pool, and began skimming the top of the water. *Id.* While he was skimming, Jane Doe 1 put her feet in the pool. *Id.* at 31. Mr. Clay went inside to retrieve his swimsuit and towels. *Id.* When he returned, Jane Doe 1 was in the pool in her bra and underwear. *Id.* Mr. Clay joined her in the pool and the two swam for about thirty minutes before sitting on the stairs. *Id.* at 32–33. Next, Mr. Clay described how Jane Doe 1 reached over him to grab her beer. *Id.* He thought it was "a very intentional move" because she could have reached around him. *Id.* at 34.

At that time, Mr. Clay put his hands around her waist and began kissing her chest. *Id.* She took her bra and underwear off and he started to kiss her breasts. *Id.* Mr. Clay testified the

two continued to touch and kiss each other until Jane Doe 1 initiated sexual intercourse. *Id.* at

34.  He indicated that he wanted to use a condom, so Jane Doe 1 performed oral sex on Mr. Clay.

*Id.* at 34–35.  He testified Jane Doe 1 was aggressive, and it became very painful for him. *Id.*  At

that point, Mr. Clay jumped back and "kind of pushed her back from her shoulders." *Id.* He

exited the pool and went inside to get pain medication. *Id.*  Instead of returning to the pool, Mr.

Clay went to the kitchen until Jane Doe 1 got dressed and joined him inside. *Id.* at 36.  She

apologized to Mr. Clay, and they began listening to country music from their phones. *Id.* at 37.

After some time passed, Mr. Clay and Jane Doe 1 moved from the kitchen to the den

area. *Id.*  Jane Doe 1 noticed a manilla envelope that read "Dona Ana County Sheriff's

Department" and asked if he was a police officer. *Id.* at 40.  Mr. Clay told her he was not a

police officer. *Id.*  They continued listening to music and enjoying refreshments. *Id.* at 41.  Mr.

Clay testified some of Jane Doe 1's dancing "was more suggestive" so he asked for a lap dance,

and she agreed. *Id.* at 41–42.  During the lap dance she removed all her clothes. *Id.*  Then Mr.

Clay took a body shot off Jane Doe 1, she pulled his shorts down, and began performing oral sex

on him. *Id.*

Next, they moved into a bedroom. *Id.* at 43.  Mr. Clay laid down on the bed and Jane

Doe 1 straddled him. *Id.* at 44.  He retrieved a condom out of his nightstand and placed it on

himself. *Id.*  Jane Doe 1 requested lubricant and Mr. Clay informed her it was in a drawer in his

nightstand. *Id.*  While searching for the lubricant, she found a pair of handcuffs. *Id.* at 45.  She

told him he could put the handcuffs on her for an additional charge. *Id.*  He agreed to pay $40 to

use the handcuffs. *Id.* at 46.  Mr. Clay used the lubricant on himself and put handcuffs on Jane

Doe 1 after she turned around and put her hands behind her back. *Id.*  According to Mr. Clay,

they engaged in consensual vaginal and anal intercourse. *Id.* at 46–48.

Next, Mr. Clay unlocked the handcuffs and Jane Doe 1 went to the bathroom. *Id.* at 48. After some time passed and she had not left the bathroom, Mr. Clay asked if she was okay. *Id.* at 49. She informed him that she needed meth. *Id.* After she opened the door, he started hearing things break. *Id.* Once he looked in the bathroom, he saw "everything in [his] medicine cabinet was thrown on the floor." *Id.* Jane Doe 1 went through his bathroom sink and pulled out the pill bottles despite Mr. Clay telling her he did not have any drugs. *Id.* at 50.

Mr. Clay lifted Jane Doe 1 by her arm and escorted her out of the bathroom and into the den area to get her clothes. *Id.* During the walk to the den, she increased the price of her services. *Id.* He refused the price and told her to get dressed. *Id.* Jane Doe 1 told Mr. Clay, in addition to the increased charge, he owed her meth. *Id.* She threatened a rape accusation if he did not provide more money and meth. *Id.* at 51. He went to his wallet, pulled out the cash he had, and laid it on the table where Jane Doe 1 had left her phone. *Id.* Mr. Clay's cash was less than what he owed Jane Doe 1, so he told her he would take her to an ATM. *Id.* at 52.

After Jane Doe 1 located her shoes, they exited the house through the garage and entered his truck. *Id.* at 53. Originally, she asked to be taken back to the bus stop. *Id.* at 54. On the way, she pointed to a gas station and said it had an ATM. *Id.* at 55. Mr. Clay informed her wherever they stop is where he is going to drop her off, so she asked him to keep driving. *Id.* Soon after, she told him to exit onto Cotton Street because she knew a meth dealer there. *Id.* at 55–56. After he exited, he saw a man in an alleyway, and Jane Doe 1 requested he stop the vehicle. *Id.*

Once Mr. Clay stopped the vehicle, Jane Doe 1 told him to wait for her because she was going to buy meth with the cash he gave her, and they would get the rest at an ATM. *Id.* Jane Doe 1 reminded Mr. Clay that she knew his name and address, and if he left, she would call the

police.  *Id.* at 57.  When she exited the vehicle, Mr. Clay noticed her phone in the seat.  *Id.*  He

saw a car coming and became worried that it could be a police officer.  *Id.* at 58.  Mr. Clay took

Jane Doe 1's cell phone, threw it out the window, and drove away.  *Id.*

   *C.  Other Evidence*

   During trial, the jury heard testimony from other witnesses, including Mr. Clay's adopted

daughter, Jane Doe 2, the responding officer, Officer Torres, the examining nurse, Karla Salazar,

the Circle K clerk, Adela Saucedo, and FBI Special Agent, Sean Macmanus.  The relevant

aspects of their testimonies are summarized below.

   *1.  Jane Doe 2*

   At 14 years old, Jane Doe 2 was adopted by Mr. Clay and his then-wife.  May 2, 2023 Tr.

(Doc. 136) at 84.  Jane Doe 2 testified when she first moved in with the Clays her therapist

recommended either Mr. or Mrs. Clay stay in her room at night until she fell asleep.  *Id.* at 90.

When Mr. Clay would stay in her room, he would lay on the bed with her, first, outside of the

sheets, but he eventually began laying under the sheets with her.  *Id.* at 91.  One night, she woke

up to Mr. Clay holding her hand onto his penis and rubbing it until he ejaculated.  *Id.*  During

this time, Mr. Clay said, "Good girl.  That's a good job.  You're doing a great job."  *Id.* at 92.

Mr. Clay told her she could not tell anyone.  *Id.*

   Jane Doe 2 next testified about "dad and daughter dates," where Mr. Clay would teach

her the proper way a man should love her.  *Id.* at 92–93.  On multiple occasions, Mr. Clay

instructed Jane Doe 2 to put her mouth around his penis until he ejaculated.  *Id.* at 93.  When

Jane Doe 2 would throw up after, Mr. Clay told her she was doing a good job, she just needed to

learn how to swallow.  *Id.*  The next time, Mr. Clay held her chin so that she had to swallow his

semen. *Id.* at 93–94. Jane Doe 2 testified Mr. Clay would always say, "You're doing a good job. You're a good girl." *Id.* at 94.

On another occasion, Mr. Clay used lubricant out of a drawer, put it on Jane Doe 2, and penetrated her anally without consent. *Id.* at 95. She testified it was very painful, and after he ejaculated, she went to the restroom and noticed she was bleeding. *Id.* The next time, Mr. Clay penetrated her vaginally without consent. *Id.* at 97. On both occasions, Mr. Clay told Jane Doe 2 that she was doing a "good job" and was a "good girl." *Id.* at 95, 98. Mr. Clay also told her, "We don't talk about this any other times because it would hurt your mom, and she probably wouldn't believe you." *Id.* at 98. Jane Doe 2 continued to testify about another occasion very similar to those previously discussed. *Id.* at 99–100.

Jane Doe 2 reported the assaults to police after the abuse continued for about one year. *Id.* at 101. After persuasion from Mr. Clay, however, Jane Doe 2 withdrew her report and moved back in with the Clays. *Id.* at 104.

Mr. Clay did not assault Jane Doe 2 again until she was legally an adult. *Id.* at 105. In 2021, after an argument between the two, Jane Doe 2 testified Mr. Clay arrived unannounced, at her home. *Id.* at 109. He was very aggressive and pushed her to the bedroom. *Id.* Mr. Clay said, "You're going to learn not to be disrespectful." *Id.* At the time, Jane Doe 2 was pregnant, and out of fear of hurting her child, she minimally resisted his shoving. *Id.* Mr. Clay raped her while stating, "You'll eventually learn to not be disobedient." *Id.* at 110.

### 2.   *Responding Officer Torres*

Officer Torres testified he was dispatched to the Circle K the morning of August 5, 2021. *Id.* at 169–70. He stated Jane Doe 1 was visibly shaken up and distraught. *Id.* at 170. He noticed redness around her wrists and slight indentations on her skin. *Id.* at 171. Officer Torres

testified the handcuffs must have been pressed on both sides of Jane Doe 1's wrists. *Id.* at 179.

Based on his observations, the handcuffs were used in the more restrictive placement, consistent

with her description. *Id.* at 181–82.

### 3.  *Certified Sexual Assault Nurse Karla Salazar*

Nurse Salazar testified Jane Doe 1 had an abrasion to her left eyebrow, and her head was

tender. *Id.* at 208.  She stated Jane Doe 1 had thin red lines on both of her wrists and injuries to

her vagina and anus.  *Id.*  Nurse Salazar testified the injuries she observed were consistent with

what Jane Doe 1 had described.  *Id.* at 208–09.  As it relates to the tears in Jane Doe 1's vagina

and anus, Nurse Salazar testified those can be caused by consensual sex or sexual assault.  *Id.* at

210.  She stated the injuries she observed in Jane Doe 1's vagina and anus were consistent with

the events Jane Doe 1 described.  *Id.*

### 4.  *Circle K Clerk Adela Saucedo*

Adela Saucedo was working as a clerk at the Circle K on August 5, 2021, when Jane Doe

1 entered the store.  *Id.* at 160.  Jane Doe 1 told Ms. Saucedo she was raped, so Ms. Saucedo

called 911 and handed the phone to Jane Doe 1.  *Id.*  Jane Doe 1 was so hysterical that Ms.

Saucedo had to communicate with the operator instead of Jane Doe 1.  *Id.*  Ms. Saucedo testified

Jane Doe 1 had markings on her wrists, which she described to the operator.  *Id.* at 162.

### 5.  *FBI Special Agent Sean Macmanus*

Special Agent Sean Macmanus (Macmanus) is a member of the Cellular Analysis Survey

Team.  May 3, 2023 Tr. (Doc. 137) at 125.  Macmanus testified, based on Google location

information and AT&T cell site activations, Jane Doe 1's cell location was near Church's

Chicken at 9:03 PM.  *Id.* at 159.  According to Macmanus, the phone was in a vehicle traveling

southwest on I–10 at 9:05 PM and 9:07 PM.  *Id.*  Jane Doe 1's Google location showed the

phone moved from central El Paso to the vicinity of Mr. Clay's home. *Id.* at 162. From 9:27 PM until 1:17 AM, Jane Doe 1's phone was near Mr. Clay's home. *Id.*

The next Google location was collected at 2:19 AM, and two AT&T points were collected after 2:00 AM. *Id.* at 164. Based on that data, Macmanus determined the phone was no longer at Mr. Clay's home but was traveling on I–10 toward central El Paso. *Id.* at 165. Macmanus testified the locations collected between 2:02 AM and 2:19 AM went only from an area near Mr. Clay's home to the area near Octavia Street. *Id.* at 176. From 2:21 AM until 2:35 AM, the phone was stationary near the intersection of Octavia Street and Missouri Avenue. *Id.* at 168–69. Macmanus testified the phone remained in that area despite Jane Doe 1 calling 911 from the Circle K, over three quarters of a mile away, at 2:26 AM. *Id.* at 170. Macmanus stated, in his expert opinion, Jane Doe 1 could not have had her phone with her at the Circle K while the phone location was collected near Octavia Street. *Id.* at 170–71.

On cross examination, Macmanus testified Jane Doe 1's phone was using data during the trip to Mr. Clay's home. *Id.* at 178. Macmanus explained he could not determine whether the phone was in use based on the data usage but stated it could have been from actual use or background applications. *Id.* at 179–82. Macmanus acknowledged increasing data usage but was unable to determine what may have caused these variances. *Id.* at 182–84. Macmanus determined Jane Doe 1's phone was at Mr. Clay's home for just under four hours. *Id.* at 189. Concerning the return trip, Macmanus testified it was possible Jane Doe 1 had her phone at the intersection of Octavia and Missouri and quickly walked to the Circle K by the time the 911 call was made. *Id.* at 195.

At the close of the Government's case, Mr. Clay motioned for a directed verdict and the motion was denied. (Doc. 92). The jury convicted Mr. Clay on both counts. Jury Verdict (Doc. 104).

II.     *Legal Standard*

Fed. R. Crim. P. 33(a) permits a new trial "if the interest of justice so requires." "[M]otions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). The remedy, however, is "regarded with disfavor." *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999) (citing *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997)).

The court should grant a new trial "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Cesareo–Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994)). Said another way, a new trial is warranted where the verdict is "contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *Evans*, 42 F.3d at 593 (internal quotation and citation omitted). The court has broad authority to weigh the evidence and consider the credibility of the witnesses. *Id.*

III.    *Discussion*

In support of his Motion for New Trial, Mr. Clay argues: (1) the verdict was not supported by sufficient evidence; (2) the verdict was contrary to the weight of the evidence; and (3) he did not receive a fair trial because the Government was permitted to introduce evidence that should have been excluded. (Doc. 106) at 6; (Doc. 131).

A. *Sufficiency of the Evidence*

Mr. Clay, in support of his contention there is insufficient evidence to support the verdict, argues Jane Doe 1 was not credible. (Doc. 106) at 3–4. He believes the Government's case rested entirely on her credibility. He claims, because she was not credible, the Government did not fully prove its case. The Court disagrees. Although credibility determinations and sufficiency of evidence are separate issues, the Court discusses each issue below.

1. *Credibility*

The Court acknowledges Jane Doe 1 occasionally gave inconsistent testimony. Mr. Clay, however, does not provide any authority showing inconsistent testimony is, on its own, sufficient to merit a new trial. Courts should leave the verdict undisturbed where the jury was able to make credibility determinations and weigh the evidence as it saw fit. *See, e.g.*, *United States v. Sanchez*, 969 F.2d 1409, 1415–16 (2d Cir. 1992) (concluding "insignificant" inconsistencies in officers' testimony "presented a credibility question for the jury, at most"). The Court concludes these inconsistencies have only peripheral significance, which allowed a reasonable jury to find Jane Doe 1 credible.

Exercising its discretion and broad authority to consider credibility, the Court may make its own witness credibility determination. "Credibility…is a matter for the district court." *United States v. Draper*, 24 F.3d 83, 85 (10th Cir. 1994). This is because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer* City, 470 U.S. 564, 575 (1985) (citing *Wainwright v. Witt*, 469 U.S. 412 (1985).

The Court on its own and considering all evidence, makes the same credibility determination as the jury. The court considers: (1) the testimony of Jane Doe 2 and notes the

similarity between her testimony and Jane Doe 1's; (2) Ms. Saucedo's testimony describing Jane

Doe 1 as "hysterical," consistent with one's demeanor after experiencing sexual assault; (3)

Officer Torres' testimony explaining the markings on Jane Doe 1's wrists resulted from

handcuffs placed in a tight and restrictive manner; (4) Nurse Salazar's testimony stating the tears

in Jane Doe 1's anus and vagina were consistent with sexual assault; and (5) Special Agent

Macmanus' testimony explaining the location of Jane Doe 1's cell phone was consistent with her

testimony that she jumped out of the car without her phone and ran to the Circle K.[1]  In making

its determination, the Court also notes Jane Doe 1's demeanor during trial as truthful and

genuine.  For these reasons, the Court determines Jane Doe 1 was a credible witness.

The Court is unpersuaded by Mr. Clay's argument that Jane Doe 1 was not credible and

addresses the sufficiency of evidence for each count below.

### 2.  *Sufficiency of the Evidence for Count I, Kidnapping*

As the Court instructed the jury, in order to convict the Defendant of kidnapping, the

Government had to prove the following elements beyond a reasonable doubt: (1) the Defendant

knowingly acting contrary to law, kidnapped Jane Doe 1 by seizing, confining, inveigling,

decoying, kidnapping, abducting, or carrying away; (2) the Defendant kidnapped Jane Doe 1 for

some purpose or benefit; (3) the Defendant willfully transported Jane Doe 1; and (4) the

transportation was in interstate commerce.  Jury Instr. (Doc. 97) at 6; 18 U.S.C. § 1201(a)(1).

The Court explained, "[t]o 'kidnap' a person means to unlawfully hold, keep, detain or

confine the person against that person's will."  (Doc. 97) at 6.  "To 'inveigle' a person means to

lure, or entice, or lead the person astray by false representations or promises, or other deceitful

---

[1] Special Agent Macmanus also corroborated Jane Doe 1's version of their return trip to El Paso.
He stated there was no travel other than a direct path from around Mr. Clay's house to the
Octavia Street area.

means. *Id.* Further, "[t]o 'decoy' a person means to entice or lure the person by means of some fraud, trick, or temptation." *Id.* "[T]he term 'willfully' means that the defendant acted voluntarily and with the intent to violate the law." *Id.* at 7.

The Court concludes sufficient evidence existed for a jury to find Mr. Clay kidnapped Jane Doe 1 in violation of 18 USC § 1201(a)(1). As to the first element, Mr. Clay drove Jane Doe 1 across state lines to an isolated area she was unfamiliar with, which effectively confined her to his home. Moreover, Mr. Clay does not dispute he handcuffed Jane Doe 1. Officer Torres' testified that Mr. Clay handcuffed her in a manner to restrict her movements. Based on this testimony, the evidence is sufficient to find Mr. Clay knowingly kidnapped Jane Doe 1 by confinement. Also, Jane Doe 1 testified she asked Mr. Clay for a ride to a friend's house. Mr. Clay agreed to give her a ride but ultimately drove her to his home across state lines. This evidence is sufficient for a jury to determine Mr. Clay decoyed (tricked) Jane Doe 1 into his vehicle to take her to his home.

For the second element, Jane Doe 1 testified Mr. Clay drove her to his home instead of her friend's house. She was hit and handcuffed when she denied his sexual advances. Mr. Clay then forced Jane Doe 1 to engage in sexual activity without her consent and while she was handcuffed. Thus, a jury could reasonably infer that Mr. Clay kidnapped Jane Doe 1 for the benefit of sexual activity. Furthermore, according to Mr. Clay, he drove Jane Doe 1 to his home and handcuffed her for his sexual gratification. Regardless of whose testimony the jury presumes to be credible, the evidence is sufficient to determine Mr. Clay had some purpose or benefit from kidnapping Jane Doe 1.[2]

---

[2] The jury did not have to agree on the purpose or benefit but only had to find a purpose or benefit was present. *Id.* at 6.

As to the third element, Mr. Clay voluntarily picked up Jane Doe 1 from the bus stop and at some point, during the transportation, intended to pay her for sexual services. Because prostitution is a crime, Mr. Clay voluntarily transported Jane Doe 1 with the intent to violate the law. Based on this evidence, a reasonable jury could determine Mr. Clay willfully transported Jane Doe 1.

Although the Court finds this evidence sufficient by itself, Mr. Clay's intent to violate the law may also be inferred by the similarities in Jane Doe 1 and Jane Doe 2's testimony. Like his assaults on Jane Doe 2, Mr. Clay isolated Jane Doe 1 and used lubricant to penetrate her without consent. He used terms like "good girl" with Jane Doe 1 as he did with Jane Doe 2. Like his intent to teach Jane Doe 2 not to be disrespectful, he told Jane Doe 1 she was a "bad girl" and needed to be a "good girl." He attempted to make both victims believe they could not seek help after the assaults. Based on these similarities, a reasonable jury could infer that Mr. Clay intended to violate the law (penetration without consent) when he transported Jane Doe 1.

Finally, both parties testified Jane Doe 1 rode in a vehicle with Mr. Clay and arrived at his home in Anthony, New Mexico. Although parties dispute when intent for sexual activity arose, it is uncontroverted Mr. Clay picked up Jane Doe 1 in El Paso, Texas and drove her to his residence in Anthony, New Mexico. This required parties to cross state lines which qualifies as interstate commerce.

### 3. Sufficiency of the Evidence for Count II, Transportation for Illegal Sexual Activity

As the Court instructed the jury, in order to convict the Defendant of transportation for illegal sexual activity, the Government had to prove the following elements beyond a reasonable doubt: (1) the Defendant knowingly transported Jane Doe 1 across a state line; and (2) the

16

Defendant transported Jane Doe 1 with the intent Jane Doe 1 would engage in sexual activity for which a person can be charged with a criminal offense.  Jury Instr. (Doc. 97) at 8.

The Court explained, "[a]n act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake, or some other innocent reason." (Doc. 97) at 8.  "[I]t is sufficient if the intent to commit a sexual act was one of the Defendant's efficient and compelling purposes, or one of the Defendant's dominant purposes for traveling across state lines." *Id.*  The jury must agree the Defendant had intent to engage in a sexual act when he crossed state lines.  *Id.*

To constitute a criminal offense, the Court instructed the jury that criminal sexual penetration and prostitution are crimes.  *Id.* at 9.  Criminal sexual penetration involves sexual acts performed without the consent of the victim and with "intent of the perpetrator to arouse or gratify the sexual desire." *Id.*  Prostitution involves "knowingly engaging in or offering to engage in a sexual act for hire." *Id.*

The Court concludes there is sufficient evidence for a jury to convict Mr. Clay of transportation for illegal sexual activity in violation of 18 U.S.C. § 2421(a).  As to the first element, Mr. Clay testified he drove Jane Doe 1 to his home in Anthony, New Mexico after picking her up in El Paso, Texas.  He testified he was just driving because Jane Doe 1 did not provide him an address.  But Mr. Clay did not request an address after five minutes, instead, he drove past state lines to his home.  Based on this evidence, a reasonable jury could determine Mr. Clay did not accidentally or mistakenly end up at his home in New Mexico.  Regardless of whether the sexual acts were consensual, Mr. Clay knowingly and intentionally drove to his home, crossing state lines.

For the second element, Mr. Clay told Jane Doe 1 he would take her to a friend's house, but instead took her to his home. At his home, Mr. Clay handcuffed Jane Doe 1 after she refused his sexual advances. Without consent, Mr. Clay penetrated Jane Doe 1 orally, vaginally, and anally. As discussed in the previous section, the similarities between the assaults on Jane Doe 1 and Jane Doe 2 give credence to Mr. Clay's intent to sexually assault Jane Doe 1 without her consent. This evidence is sufficient for a reasonable jury to find that Mr. Clay transported Jane Doe 1 with the intent to commit criminal sexual penetration.

Moreover, according to Mr. Clay, he picked up Jane Doe 1 and after some conversation, believed she was a prostitute. At that time, Mr. Clay agreed on a set price to pay Jane Doe 1 for sexual services. Mr. Clay testified he did not decide to hire Jane Doe 1 as a prostitute until just past state lines. The jury, however, heard from Mr. Clay that Jane Doe 1 asked for a ride five minutes down the road. Despite her request for a five–minute ride, Mr. Clay continued to transport Jane Doe 1 to his home in Anthony, New Mexico, where he paid her for sexual services. Based on this testimony, a reasonable jury could presume Mr. Clay intended to engage in illegal sexual activity before crossing state lines.

For all the reasons stated above, the Court concludes the evidence presented in the Government's case in chief was sufficient to convict Mr. Clay on both counts charged in the indictment.

### B. Weight of Evidence

Mr. Clay appears to argue that even if the evidence is sufficient to sustain the verdict, the Court may set it aside if the evidence weighs heavily against the verdict such that a serious miscarriage of justice may have occurred. (Doc. 106) at 5. Mr. Clay, however, does not describe any evidence that weighs heavily against the verdict. *Id.* As discussed above, this

Court will leave the verdict undisturbed where the jury was able to make credibility determinations and weigh the evidence. The Court concludes the evidence does not weigh heavily against the verdict such that a serious miscarriage of justice may have occurred.

### C. Mr. Clay Received a Fair Trial

#### 1. Reconsideration of Motions and Admitted Evidence

Mr. Clay argues in both his Motion for New Trial (Doc. 106) and his Reply (Doc. 131) certain evidence was improperly excluded or admitted, which resulted in an unfair trial. During the pre-trial stage, Mr. Clay submitted Motions in Limine and now asks the Court to reconsider its rulings on those Motions. (Doc. 106) at 5–6. In his Motion for New Trial, Mr. Clay "preserves all arguments set forth in those motions and requests reconsideration of the Court's ruling[s]." [3] *Id.* The Court construes Mr. Clay's Reply as advancing those arguments. [4] (Doc. 131).

"The Federal Rules of Criminal Procedure do not expressly recognize a motion to reconsider." *United States v. Christy*, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011) (citing *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010)). "In the criminal context, however, courts ordinarily apply the same standards as those used in civil cases when addressing motions to reconsider." *United States v. Harmon*, 871 F. Supp. 2d 1125, 1143 (D.N.M. 2012) (citing *Rollins* 607 F.3d at 502). According to the Tenth Circuit, it is within the court's discretion to grant or deny a motion to reconsider. *United States v. Wiseman*, 172 F.3d 1196, 1207–08 (10th

---

[3] Mr. Clay also argues cross examinations of the Government's witnesses were curtailed because he was not able to use uncertified police reports as prior inconsistent statements. (Doc. 106) at 5; (Doc. 131) at 4. During trial, the Court determined use of the reports was improper and maintains its decision.

[4] In footnotes, Mr. Clay appears to argue he was required to waive his 5th Amendment right and testify at trial, however, Mr. Clay does not provide evidence or support of this argument.

Cir. 1999).  Motions to reconsider are appropriate where the court has "misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  A motion to reconsider, however, is not an opportunity to "revisit issues already addressed or advance arguments that could have been raised in prior briefing."  *Id.*

The Court will not now reconsider Mr. Clay's Motions in Limine because the arguments and objections set forth in his Motion for New Trial and Reply have already been addressed or could have been raised in prior briefing.[5]

During the final jury instructions conference, Mr. Clay raised the issue of using DNA evidence in closing arguments.  (Doc. 93) at 1.  Mr. Clay wished to reference, suggest, or otherwise intimate that Jane Doe 1 may have been sexually active with anyone other than Mr. Clay.  Mr. Clay also wanted to suggest any potential DNA sample in Jane Doe 1's vagina or anus came from a person other than Mr. Clay.  The Court reiterates that Mr. Clay's use of DNA evidence is the exact use of evidence that is prohibited under Rule 412, regarding an alleged victim's sexual behavior.  *See* Fed. R. Evid. 412; (Doc. 93).  Being that none of the exceptions listed in Rule 412(b)(1) are satisfied, the Court concludes this evidence was properly limited.

---

[5] Although the Court does not now reconsider its Memorandum Opinion and Order (Doc. 74) denying Mr. Clay's Motion in Limine to Exclude Evidence of Other Acts (Doc. 38) and allowing Jane Doe 2's testimony at trial, it takes the opportunity to note the policy rationales behind Federal Rule of Evidence 413.  The Tenth Circuit has recognized "the need for corroborating evidence when the alleged rapist claims consent, and there are no witnesses other than the defendant and the alleged victim." *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998).  As it relates to FRE 413, "Congress believed it necessary to lower the obstacles to admission of propensity evidence in a defined class of cases." *Id.* at 1431.  Moreover, "[k]nowledge that the defendant has committed rapes on other occasions is frequently critical in assessing the relative plausibility of these claims and accurately deciding cases that would otherwise become unresolvable swearing matches." *Id.* (citing 140 Cong. Rec. S12,990 (daily ed. Sept. 20, 1994) (statement of Sen. Robert Dole)).

*IV.*    *Conclusion*

Having weighed the evidence and considered the credibility of the witnesses, this Court

concludes the evidence does not preponderate against the verdict such that a miscarriage of

justice has occurred.  This is not the exceptional case which mandates a new trial.

IT IS, THEREFORE, ORDERED that Mr. Clay's Motion for New Trial (Doc. 106) is
DENIED.


_____
UNITED STATES DISTRICT JUDGE